FILED
2012 Sep-27  PM 01:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **TRINA LAVONYA FERGUSON**, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:11-CV-2346-KOB** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of the Social**, | ) | |
| **Security Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

### I. Introduction

On November 26, 2007, the claimant, Trina Ferguson, applied for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act, respectively. The claimant alleges disability commencing on April 28, 2007. On March 18, 2008, the Commissioner denied the application. The claimant timely requested a hearing before an Administrative Law Judge, and the ALJ held a video hearing on February 4, 2010. In a decision dated February 24, 2010, the ALJ found that the claimant was not disabled as defined by the Social Security Act, and, thus, was ineligible for disability insurance benefits and supplemental security income. On May 20, 2011, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R.1). The claimant has exhausted her administrative remedies, and this

court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  For the reasons stated in the Memorandum Opinion, the court will AFFIRM the Commissioner's decision.

## II.  Issues Presented

The claimant presents the following issues for review:

1) whether the ALJ properly identified all the claimant's severe impairments when he failed to list the claimant's migraines as a severe impairment;

2) whether the ALJ properly discredited the treating physician's opinion when he determined Dr. Kelsey's treatment notes were inconsistent with his limitation assessment and the rest of the medical evidence;

3) whether the ALJ fulfilled his duty to fully develop the record when he did not seek clarification of alleged ambiguities in Dr. Kelsey's treatment notes;

4) whether the ALJ properly applied the Eleventh Circuit's three-part pain standard when he discredited the claimant's subjective pain testimony; and

5) whether the ALJ  properly determined the claimant's residual functional capacity when he did not give full credibility to the claimant's pain testimony.

## III.  Standard of Review

The standard of review of the Commissioner's decision is limited.  This court must affirm the Commissioner's decision if he applied the correct legal standard and if substantial evidence supports his factual conclusions.  42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 401 U.S. 389, 401 (1971).  A reviewing court may not look only to those

parts of the record which support the decision of the ALJ, but instead must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986). "[The curt must]. . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's]. . . factual findings. . . No similar presumption of validity attaches to the [Commissioner's]. . . legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker v. Bowen,* 826 F.2d 996, 999 (11th Cir. 1987).

## IV.  Legal Standards

Under 42 U.S.C. § 423(d)(1)(A), "a person is entitled to disability benefits when the person is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can last for a continuous period of not less than 12 months. . . ."

To make this determination the Commissioner employs a five-step, sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[1]

---

[1]*McDaniel v. Bowen,* 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI).  The same sequence applies to disability insurance benefits.  Cases arising under Title

The ALJ's finding of any severe impairment, whether from a single severe impairment or a combination of impairments that qualify as severe, is enough to satisfy the step two requirement. *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987). The ALJ must "make specific and well-articulated findings as to the effect of the combination of impairments and decide whether the combined impairments cause the claimant to be disabled." *Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984). A clear expression that the ALJ considered the combination of impairments is an adequate expression of such findings. *Jones v. Dep't of Health & Human Serv.*, 941 F.2d 1529, 1533 (11th Cir. 1991).

The ALJ must give the treating physician's testimony substantial or considerable weight, unless the ALJ provides "good cause" for refusing to do so. *Crawford v. Commissioner,* 363 F.3d 1155, 1159 (11th Cir. 2004); *see also Lewis v. Callahan*, 125 F.3 1436, 1440 (11th Cir. 1997). "'Good cause' exists when the: [sic] (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004).

The ALJ has a duty to develop a full and fair record. 20 C.F.R. § 416.912(d). "A 'full and fair record' not only ensures that the ALJ has fulfilled his 'duty. . . to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts,' but it also enables the reviewing court 'to determine whether the ultimate decision on the merits is rational and supported by substantial evidence.'" *Welch v. Bowen*, 854 F.2d 436, 440 (11th Cir. 1988)

---

II are appropriately cited as authority in Title XVI cases. *See, e.g., Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

(internal quotations and citations omitted).

To establish disability through subjective testimony, the claimant must satisfy the "pain standard."  The pain standard requires "1) evidence of an underlying medical condition, *and* (2) *either* (a) objective medical evidence confirming the severity of the alleged pain; *or* (b) that the objectively determined medical condition can reasonably be expected give rise to the claimed pain." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (emphasis added).  "A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support the finding of a disability." *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995).

"The RFC assessment only considers functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." SSR 96-8p.  Pain is a nonexertional impairment for social security and disability purposes.  *Foote*, 67 F.3d at 1559.

## V.  Facts

The claimant was thirty-eight years old at the time of the administrative hearing and had at least a high school education. (R. 23).  She previously worked as a postal clerk for 13 years. (R. 23, 44).  According to claimant, she suffers from migraines, back pain, anxiety, and depression causing her to miss too many days of work and resulting in her termination on April 28, 2007.  The claimant appealed her termination and sought reinstatement.  On January 28, 2008, some nine months after she claims her disability commenced, the claimant informed her therapost at Grayson and Associates that she was capable of returning to work.  (R. 321).  Since her termination, the claimant has not engaged in substantial gainful activity. (R. 17, 46).

*Physical Limitations*

The claimant began experiencing back pain after suffering a work-related injury in December 2001. After undergoing extensive physical therapy, claimant visited Dr. Edwin Kelsey, a pain management specialist, for continued pain in her lower back.  Dr. Kelsey diagnosed the claimant with degenerative joint disorder of the lumbosacral spine and mild obesity on June 19, 2003.  (R. 210). The claimant continued pain management treatment under Dr. Kelsey from June 2003 to June 2009. (R. 194-212, 323-41).  During that period, Dr. Kelsey prescribed a variety of medication, including pain medication for her headaches such as Lortab, Bupap (acetaminophen and butalbital for relaxing muscle contractions in a tension headache), and Topomax and Keppra (both anti-seizure medications to treat abnormal excitement in the brain, also used to treat migraine headaches).

In addition to Dr. Kelsey's treatments, the claimant received treatment for lower back pain at Baptist Health Center from Dr. Michael Chen in August 2003, November 2004, April 2005, and January 2006. (R. 223-227).  In January 2006, the claimant underwent an MRI of her spine that showed normal results. (R. 264).  The January 2006 MRI corroborated both an earlier nerve conduction study from June 2002 that showed normal nerve conduction, and an MRI performed in August 2002 that also showed a normal spine. (R. 211-12).

In November 2006, Dr. Clarence Barr treated claimant for migraines, prescribed her Topomax, and referred her for an MRI of her brain. The MRI showed a minor right posterior ethmoid inflammatory change and a hypoplastic right maxillary sinus, but did not show a significant intracranial lesion. (R. 344-46).

In October 2007, the claimant reported to Dr. Kelsey that Dr. Chen had previously

diagnosed her with fibromyalgia, and that Dr. Barr had prescribed Topamax for her migraines. Dr. Kelsey prescribed the following medications: Lortab, Soma, Ambien, Lyrica, and Bupap. (R.195.).   In a September 12, 2008 treatment note, Dr. Kelsey stated that the claimant "comes in c/o headaches; Doing OK with [illegible] pain meds; Needs refills [medications] Needs something for headaches...."  (R. 324).  In Dr. Kelsey's last three treatment notes from the claimant's visits – March 11, 2009; June 10, 2009 and September 9, 2009 – no notation exists about specific headache complaints.  Rather, the March 2009 and June 2009 notes generally state that the claimant is doing well on current medications, and the September 2009 note mentions lower back and neck pain and spasms but does not mention any headache problems.  The next document from Dr. Kelsey was the January 2010 questionnaires discussed later in this opinion, and no record exists that Dr. Kelsey met with the claimant between September 9, 2009 and the completion of the questionnaires, January 27, 2010.  (R.  323-24).

At the Disability Determination Service's (DDS) request, Dr. Bruce Romero, a board certified doctor of internal medicine and certified independent medical examiner, performed a consultative physical examination of the claimant on February 22, 2008. (R. 280-90).  Dr. Romero diagnosed the claimant with lower back pain with left leg numbness without an objectively identifiable etiological source; neck pain with no objectively identifiable etiology; and obesity. (R. 284).  Dr. Romero further concluded that claimant had no limitations on her ability to sit, stand, or walk; could lift 20 lbs. constantly; could lift 40 lbs. frequently; and could lift 60 lbs. occasionally.  Also, Dr. Romero indicated no limitations on her ability to push/pull, climb, balance, stoop, kneel, crouch, crawl, handle and manipulate, feel, talk, hear, or reach. (R. 288-89).

On January 27, 2010, Dr. Kelsey completed a "Fibromyalgia Residual Functional Capacity Questionnaire."  In that questionnaire, the doctor denied that the claimant was a malingerer.  He checked "Yes" to the question "Does your patient meet the American College of Rheumatology criteria for fibromyalgia?" When asked to "[d]escribe the nature, frequency, and severity" of the claimant's pain, Dr. Kelsey filled in the word "constant" but later in the questionnaire, when asked "How often during a typical workday is your patient's experience of pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks," Dr. Kelsey checked "frequently" as opposed to another option, "constantly."  When asked to state the degree to which the claimant could tolerate stress, Dr. Kelsey checked "capable of low stress jobs" instead of the option "incapable of even low stress jobs."  In answer to other questions, Dr. Kelsey stated that she could walk six blocks without severe pain, sit two hours at a time, and stand fifteen minutes at a time.  At another point in the questionnaire, he stated she can only walk five minutes at a time.  When asked about the claimant's job needs, Dr. Kelsey did not state that the claimant could not work, but rather, stated that she needs a job that permits shifting positions at will and five-minute unscheduled breaks twice during the eight-hour work day, but that she had no need to elevate her legs.  (R. 347-50).

In a second questionnaire, also dated January 27, 2010, Dr. Kelsey checked "Yes" to the following questions: 1) "Based on your examinations, observation and treatment of Trina Ferguson, do you believe this patient will experience symptoms (pain) from her underlying medical conditions which could reasonably be expected to cause serious distraction from job tasks and/or result in a failure to complete job tasks on a frequent basis during a typical 8 hour workday?"  2) "Based on your experience as a physician, as well as your examination,

8

observation and treatment of Trina Ferguson, would you expect that the performance of a job that required her to sit or stand for prolonged periods during an 8 hour workday would increase the level of pain she experiences?"  (R. 351-52).

*Psychological Impairments*

On April 19, 2007, Health and More, Inc. conducted a mental health assessment of the claimant, diagnosed her with anxiety disorder, and provided counseling services. (R. 190-93). The claimant also attended counseling sessions with Grayson and Associates from November 2007 to May 2008 after being diagnosed with depression. (R. 316-22).

Dr. John Neville, a licensed psychologist, conducted a consultative psychological examination of the claimant at the request of the DDS on February 6, 2008.  Dr. Neville concluded that the claimant suffered from anxiety disorder, with some depressive symptoms, but did not suffer from a mood disorder.  He recommended psychiatric treatment and psychotherapy for the next six to twelve months and provided a positive prognosis if treatment continued for the stated period.  Dr. Neville further noted that claimant's abilities to carry out instructions and interact with coworkers was only mildly impaired and her ability to cope with ordinary work pressures was moderately impaired.  (R. 275-79).

Dr. Gordon J. Rankart, Psy. D., a state agency psychological examiner and an expert in Social Security disability determinations, administered a mental RFC assessment and the Psychiatric Review Technique (PRT) exam to the claimant on March 11, 2008.  Dr. Rankart evaluated her for affective disorders under 12.04, finding that she had depression that did not precisely satisfy the criteria of depressive syndrome,  and anxiety related disorders under 12.06, finding that she had a panic disorder that did not precisely satisfy the diagnostic criteria for an

anxiety-related disorder.  However, in the space provided to provide "symptoms, signs, and laboratory findings that substantiate the presence of this impairment," Dr. Rankart did not provide any information.   In the "Consultant's Notes" in section IV. of the PRT, Dr. Rankart recorded claimant's reports of panic attacks, feeling the walls closing in and being unable to breathe, but the doctor's own observations were that she spoke clearly and coherently, had a neutral, non-labile mood and normal affect, and did not appear depressed, angry, tearful.  In analyzing claimant's functional limitations,  Dr. Rankart concluded that the claimant was capable of simple-task employment and that the evidence was consistent with less than marked mental limitations for the workplace. (R. 291-307).

*ALJ Hearing*

The Commissioner denied the claimant's request for supplemental security income and disability insurance benefits on March 18, 2008.  The claimant filed a written request for a hearing, and the ALJ held a hearing on February 4, 2010. (R. 15).  The claimant testified that she previously worked as a postal clerk sorting mail in trays weighing up to 70 pounds.  The post office terminated her because of frequent absences related to migraines, back pain, fibromyalgia, anxiety, and depression. (R. 45-46, 58).  The claimant stated that her family physician, Dr. Michael Chen, diagnosed her with migraines and fibromyalgia and referred her to Dr. Kelsey, a pain management specialist. The claimant maintained that under Dr. Kelsey's care, she tried various medications to prevent the migraines, but the medications caused dizziness, nausea, and other side effects.  At the hearing, the claimant stated that she was taking Keppra, an anti-seizure medication, to prevent migraines, but still suffered from migraines. (R. 47-51). Her attorney acknowledged that his client was not arguing that her migraines caused her to meet a seizure

10

disorder listing, because she had no medical testimony to that effect.  (R. 43).

The claimant testified that she has maybe one to two "good days" per week where she can do some laundry and household chores, but on "bad days" she is bedridden.  She further stated that she exhibits sensitivity to cold weather, which tends to activate her fibromyalgia.  The claimant also reported that she was receiving counseling services from Grayson and Associates for depression, anxiety, and insomnia. (R. 55-57).

The ALJ inquired about the claimant's employment termination appeal. The claimant stated that the case arbitrator determined that she would be unable to return to work and denied her claim regarding improper termination. The ALJ then asked whether the claimant could perform a desk-job; the claimant answered that because of her anxiety and migraines she did not believe she could attend work on a daily basis. She claimed that while she was working at the post office, she would suffer from migraines, become dizzy and nauseated, and have to leave work.  At the time of the hearing, the claimant asserted that each week she was experiencing approximately three or four migraine headaches with accompanying nausea.

The claimant concluded her testimony stating that her fibromyalgia pain and depression had worsened since her initial benefits denial in March 2008. (R. 57-60).  The claimant did not offer any further witness testimony.

A vocational expert, Norma Stricklin, provided testimony concerning the availability of jobs that the claimant could perform. (R. 61-70).  Ms. Stricklin described the claimant's former job as a light, semi-skilled job requiring the ability to lift 70 lbs.  The ALJ asked Ms. Stricklin whether a person of the same age, education, and work experience as the claimant, with the following limitations would be able to perform the claimant's former job: can perform only at the

11

medium exertional level; can comprehend and recall brief, uncomplicated instructions; can concentrate and maintain attention for two hour periods over an eight hour day; can sustain concentration and persistence if given a flexible schedule; can engage in casual and moderately limited interaction with the public and coworkers; and can adapt to gradually introduced changes. Ms. Stricklin stated that claimant's former employment would not be possible because the job requires lifting over 50 lbs.; does not allow flexible schedules; and does not introduce changes gradually.  However, Ms. Stricklin identified medium level jobs that the claimant could perform, such as a kitchen worker or cleaner.  (R. 62-64).

The ALJ posed a second hypothetical to Ms. Strickland that included the following limitations:  limited lifting, carrying, standing, and walking; inability to climb ladders, ropes, or scaffolds; occasional stooping, kneeling, crouching, or crawling; an avoidance of temperature extremes or excessive humidity exposures; and the additional limitations stated in the first hypothetical.  Given these limitations, Ms. Stricklin stated that light level jobs are available that the claimant could perform, such as a cashier or office helper. (R. 64-65).

The ALJ provided a third hypothetical using the claimant's characteristics (age, education, and work experience), along with the limitations stated in the second hypothetical and with the additional limitation of alternating between sitting and standing.  Again, Ms. Stricklin testified that jobs exist that the claimant could perform, specifically citing an office helper, information clerk, and a food service clerk.  However, when asked whether the claimant, if her testimony is given full credibility, could perform any occupations, Ms. Stricklin stated that the claimant could not perform any jobs on a consistent basis because the claimant would be unable to attend work regularly. (R. 65-66).

*ALJ Decision*

On February 24, 2010, the ALJ issued a decision finding the claimant was not disabled under the Social Security Act.  The ALJ first found that the claimant met the Social Security Act's insured status requirements.  Secondly, he found that the claimant had not engaged in substantial gainful activity since April 27, 2007.  The ALJ further found the claimant had the following severe impairments:  degenerative joint disease in the lumbosacral spine, fibromyalgia, obesity, depression, and anxiety disorder.  The ALJ found that none of the impairments either singly or in combination met or medically equaled those in the Listing of Impairments. (R. 15-18).

The ALJ found that the claimant, despite her physical and psychological impairments, has a residual functional capacity to perform light work based on the following limitations: inability to climb ladders, ropes, or scaffolds; occasional stooping, kneeling, crouching, or crawling; limited exposure to extreme temperatures or excessive humidity; limited ability to comprehend brief, uncomplicated directions and simple instructions; limited attention and concentration for two-hour periods during an eight hour day; limited ability to sustain concentration and persistence in a flexible schedule; casual and moderately limited interaction with the public and coworkers; and only a gradual introduction to changes.  The ALJ found that claimant's medically determinable impairments could be reasonably expected to cause her pain and symptoms, but that the "intensity, persistence, and limiting effects" were not credible to the extent that they were inconsistent with the RFC assessment. (R. 19, 21).

In his findings, the ALJ primarily relied on the following:  Dr. Romero's consultative physical examination, Dr. Neville's consultative psychological examination, and Dr. Rankart's

13

RFC assessment.  The ALJ found that Dr. Romero's assessment showing few limitations and Dr. Kelsey's treatment notes stating that the claimant was doing well on prescribed medication were consistent with the objective medical tests (MRIs, X-rays, and nerve conduction tests) that yielded normal results.  However, to give the claimant the benefit of reasonable doubt, the ALJ included greater limitations than those Dr. Romero assessed, and presented those limitations to the vocational expert.  The ALJ gave significant weight to Dr. Neville's opinion, the consultative psychologist, because the ALJ found the opinion to be consistent with Dr. Rankart's RFC assessment and with Grayson and Associates' notes showing that the claimant's emotional condition had improved with proscribed therapy and medication.  The ALJ gave little weight to Dr. Kelsey's opinion in his questionnaires even though he was a treating physician, because his finding of extreme limitations in the questionnaires was inconsistent with repeated notations in his own treatment notes that she was doing well on her medication regimen and because his assessments were conducted on conclusory, counsel-supplied report forms; were unsupported by objective findings; and were inconsistent with the assessment of Dr. Romeo. (R. 21-23).

The ALJ cited other non-medical reasons for finding that the claimant's impairments were not as severe as she claimed.  The ALJ noted that the claimant appealed her termination on EEO grounds; that she informed her therapist that she was capable of returning to that type of work; and that she told her therapists that she socializes with friends and family.  The ALJ determined that claimant's subjective testimony as to her pain severity was inconsistent with documented evidence in the record. (R. 22).

The ALJ did find that the claimant was unable to perform her past relevant work as a postal clerk.  However, the ALJ found the claimant to have a residual functional capacity to fully

14

perform light work and held that a significant number of jobs exist in the national economy that

the claimant could perform.  Therefore, the ALJ concluded that the claimant was not disabled as

defined by the Social Security Act. (R. 23-24).

## VI. Discussion

**I.**    **Whether the ALJ properly identified all the claimant's severe impairments when he failed to list the claimant's migraines as a severe impairment.**

The claimant asserts that the ALJ committed reversible error when he failed to include

migraines in his severe impairment findings under step two of the disability determination

process.  Although the ALJ did not include migraines in his severe impairment findings at step

two, the ALJ clearly expressed that he considered and included the claimant's migraines at

subsequent steps in his decision.  Therefore, the ALJ did not commit reversible error.

In the second step in a disability determination, the Commissioner "determines whether a

claimant has a 'severe' impairment or combination of impairments that cause more than a

minimal limitation on a claimant's ability to function."  *Davis v. Shalala*, 985 F.2d 528, 532 (11th

Cir. 1993);  20 C.F.R. §§ 404.1520, 416.20.   Step two basically acts as a filter to limit non-severe

impairments from being considered; if no severe impairment or combination of impairments

together qualifying as severe are shown, the claim is denied.  *Jamison*, 814 F.2d at 588.  However,

the finding of *any* severe impairment is enough to satisfy step two, and the disability

determination process continues. *Id.*  After step two, the ALJ must consider the claimant's entire

medical condition, including impairments the ALJ determined were not severe in combination

with others. *Id.*  The ALJ must make specific and well-articulated findings as to the effect of the

combination of all of the claimant's impairments. *Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir.

15

1984).  A clear expression that the ALJ considered the combination of impairments is an adequate expression of such findings.  *Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1533 (11th Cir. 1991).

In the instant case, the ALJ identified the following as severe impairments:  degenerative joint disease in the lumbosacral spine, fibromyalgia, obesity, depression, and anxiety disorder. The ALJ did not include migraines in his list of severe impairments.  Although the ALJ did not list the migraines as a severe condition in step two, he considered and evaluated her migraines in subsequent steps in his analysis.  For example, in evaluating the claimant's RFC, the ALJ acknowledged that the claimant "alleges that she is disabled due to her migraines, fibromyalgia, and depression."  (R.  20).  He recognized several times in the RFC analysis that the claimant had received a diagnosis for migraines, and that she had testified to taking migraine medication, mentioning her complaints regarding migraines as well as documentation in the record of her migraine medication and treatment for migraines.  Further, he referred to Dr. Barr's treatments for her migraines and the MRI test of the claimant's brain.  The ALJ noted in his decision that the MRI did show a minor right posterior ethmoid inflammatory change and a hypoplastic right maxillary sinus.  The ALJ's clear acknowledgment that the claimant was diagnosed and treated for migraines indicates that the ALJ considered the migraines as a limiting impairment throughout his assessment.

Furthermore, because step two only acts as a filter to prevent non-severe impairments from disability consideration, the ALJ's finding of other severe impairments allowed him to continue to subsequent steps of the determination process and his failure to list headaches as severe does not constitute reversible error because, under the Social Security regulations, the ALJ at later steps

16

considers the combined effect of all the claimant's impairments. *See Fellows v. Astrue,* 2011 WL 4005239, *3 (M.D. Ala. 2011) (acknowledging that "an ALJ's failure to find an additional [mental] impairment to be 'severe' may be harmless, even if erroneous, where the ALJ proceeds beyond step two of the sequential analysis and it is apparent from the decision that the ALJ considered any limitations imposed by the impairment in the claimant's residual functional capacity," but nevertheless finding reversible error because the ALJ "included no mental limitations whatsoever in her RFC finding despite her conclusion that plaintiff has moderate limitations in social functioning and in maintaining concentration, persistence and pace."); *see also Brescia v. Astrue*, 287 Fed. Appx 626, 628-29 (10th Cir. July 8, 2008) (holding that once an ALJ has found at least one severe impairment at step two, no reversible error exists for failing to designate another impairment as severe because at later steps the agency considers the combination of all impairments).   Therefore, because other severe impairments existed at step two and allowed the ALJ to continue the disability determination process and because the ALJ clearly articulated his consideration of the claimant's migraines as part of his assessment of the combined impairments, the ALJ did not commit reversible error.   Given the subsequent analysis involving migraines, any error in failing to include the word "migraine" in the list under step two is harmless.

**II.**      **Whether the ALJ properly discredited the treating physician's opinion when he determined Dr. Kelsey's treatment notes were inconsistent with his limitation assessment and the rest of the medical evidence.**

The claimant asserts that no substantial evidence exists to reject the opinion of the treating physician, Dr. Kelsey.   The claimant further argues that the ALJ committed reversible error because he improperly discredited and did not give sufficient weight to Dr. Kelsey's opinion in his

questionnaires.  However, the court finds that the ALJ's decision demonstrates that good cause existed for the ALJ's decision to give little weight to Dr. Kelsey's opinion.

The ALJ must show "good cause" if he does not afford substantial or considerable weight to the treating physician's opinion.  *Crawford v. Commissioner*, 363 F.3d 1155, 1159 (11th Cir. 2004); *see also Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).  "'Good cause' exists when the: [sic] (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004).  The ALJ may discount a treating physician's report when it is not accompanied by objective medical evidence or is wholly conclusory.  *Crawford*, 363 F.3d at 1159.  No reversible error exists where the ALJ articulated specific reasons for failing to give the treating physician's opinion controlling weight, and substantial evidence supports those reasons.  *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).  The ALJ may reject any medical opinion if the evidence supports a contrary finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).

The ALJ expressly articulated his reasons for discounting Dr. Kelsey's opinion.  First, the ALJ found that Dr. Kelsey's opinion was inconsistent with his own treatment notes.  As the ALJ noted, Dr. Kelsey repeatedly stated in his visit notes that the claimant's headaches were under control; none of the treatment notes in 2009, the year before he filled out the questionnaires, indicates a problem with headaches.  At the March and June 2009 visits, he states that the claimant is doing well/OK with her medication regimen.  In the September 2009 visit notes, the last visit before he completed the questionnaires, Dr. Kelsey addresses pain in her lower back and neck but does not mention headaches.  Thus, to the extent that Dr. Kelsey's opinion in the

questionnaires finding extreme limitations refers to her headache pain, that opinion is inconsistent with his treatment notes.

To the extent that the opinion refers to fibromyalgia pain or a combination of headache and fibromyalgia pain, the court also notes that the information in the two January 27, 2010 questionnaires themselves appear to be somewhat inconsistent even though they bear the same date.  In the first fibromyalgia RFC questionnaire, Dr. Kelsey states at one point that the claimant is capable of performing low stress jobs and answers numerous questions that indicate she is able to work with certain restrictions. However, in the second questionnaire, he indicates that her pain is a serious distraction from her job tasks and/or would result in a failure to complete job tasks on a frequent basis, an opinion indicating that she would not be able to work even low stress jobs. At one point in the fibromyalgia questionnaire, he states that she can walk six city blocks without severe pain but later says she can only walk five minutes at a time, and the court notes that walking six blocks in five minutes would be quite fast hike.  The two statements appear to be inconsistent.  Further, three out of the four treatment notes in the year and a half before the questionnaires indicate that the claimant was doing well/OK with the medication regimen and pain management, statements that appear to conflict with the opinion in questionnaire two that her pain is a serious distraction from job tasks and/or would frequently affect her ability to complete a job.  The last treatment note does record complaints of lower back pain and neck pain; however, the record reflects that after receiving medication for the pain, she did not contact the doctor's office with follow-up complaints.  In short, the court agrees with the ALJ's assessment that Dr. Kelsey's opinion is inconsistent internally and with his treatment notes.

Secondly, the objective tests, including the MRIs, X-rays, and nerve conduction tests,

produced normal results and did not support Dr. Kelsey's extreme limitation assessment.

Moreover, Dr. Kelsey's assessment was inconsistent with Dr. Romero's comprehensive

examination that demonstrated few limitations on the claimant's ability to properly move or lift

and found no objectively identifiable entiology for the claimant's lower back pain, leg numbness,

and neck pain.  Lastly, the ALJ found that Dr. Kelsey prepared his assessment on counsel-

supplied forms, with conclusory questions designed to elicit "yes" or "no" responses and framed

to support the claimant's position. (R. 22).  For the above reasons, the ALJ demonstrated good

cause for according little weight to Dr. Kelsey's opinion.  This court finds that substantial

evidence supports the ALJ's decision on this issue.

**III.    Whether the ALJ fulfilled his duty to fully develop the record when he did not seek
          clarification of alleged ambiguities in Dr. Kelsey's treatment notes.**

The claimant asserts that the ALJ failed to fully develop the record.  The claimant

contends that the ALJ had a duty to contact Dr. Kelsey to determine what he meant when he wrote

that the claimant was "doing O.K. on her meds" and that the ALJ's failure to do so constitutes

reversible error.  This court finds that the ALJ had no such duty to re-contact Dr. Kelsey because

sufficient evidence existed to determine the claimant's disability status.

The ALJ has a duty to develop a full and fair record.  20 C.F.R. § 416.912(d).  This

requirement ensures that the ALJ "'scrupulously and conscientiously probe[s] into, inquire[s] of,

and explore[s] . . . all the relevant facts,' and enables the reviewing court to 'to determine whether

the ultimate decision on the merits is rational and supported by substantial evidence.'" *Welch*, 854

F.2d at 440.  However, medical sources only need to be re-contacted when the evidence received

from the source is not adequate to determine a claimant's disability.  20 C.F.R. §§ 404.1512(e),

416.912(e); *Gallina v. Commissioner of Social Sec.*, 202 Fed. Appx. 387, 388 (11th Cir. 2006).

The ALJ based part of his decision that claimant did not have a disability on Dr. Kelsey's treatment notes that stated the claimant was doing fine on her prescribed medication.  The ALJ reasoned that Dr. Kelsey's notation meant that the medication adequately suppressed the claimant's pain and other impairment symptoms to a manageable level and was consistent with Dr. Romero's physical assessment.  The claimant asserts that Dr. Kelsey's notes were ambiguous and that the ALJ needed to contact Dr. Kelsey to ensure that the ALJ had the correct interpretation.  However, the ALJ had no duty to re-contact Dr. Kelsey, unless the reports obtained from Dr. Kelsey were inadequate to determine the claimant's disability status.

Dr. Kelsey provided an extensive amount of treatment notes and a limitation assessment to the ALJ.  The ALJ discredited Dr. Kelsey's limitation assessment in his questionnaires because of the inconsistencies with the doctor's own treatment notes that indicated the claimant's medications were relieving her impairments.  Although the ALJ discredited Dr. Kelsey's limitation assessment in the questionnaires, the ALJ found that Dr. Kelsey's treatment notes were consistent with Dr. Romero's physical assessment and the claimant's objective medical tests showing little or no limitations.  Furthermore, the ALJ obtained additional assessments from Drs. Romero, Rankin, and Neville to fully develop the record and to determine the claimant's disability status.  The ALJ did not commit reversible error because the ALJ had adequate information from both Dr. Kelsey and other sources to determine the claimant's disability status and had no duty to re-contact Dr. Kelsey.

**IV.    Whether the ALJ properly applied the Eleventh Circuit's three-part pain standard when he discredited the claimant's subjective pain testimony.**

The claimant asserts that the ALJ improperly discredited the claimant's testimony about her pain and limitations.  The claimant states that the ALJ erred because he discredited her testimony despite medical evidence showing impairments that could cause the pain.  However, the ALJ found that the claimant's testimony was not credible based on the medical and non-medical evidence in the record.  The court finds no error because the ALJ properly applied the pain standard and explicitly articulated specific reasons for discrediting the claimant's testimony about the *extent* of her pain.

A three-part pain standard applies if the claimant attempts to establish disability through her own testimony of pain or other subjective symptoms.  The pain standard requires "1) evidence of an underlying medical condition, *and* (2) *either* (a) objective medical evidence confirming the severity of the alleged pain; *or* (b) that the objectively determined medical condition can reasonably be expected give rise to the claimed pain." *Wilson*, 284 F.3d at 1225 (emphasis supplied).  "A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability." *Foote*, 67 F.3d at 1561.  If no evidence exists that the ALJ properly applied the three-part standard, the court must reverse the ALJ's decision. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  If the ALJ rejects the claimant's subjective testimony, he must explicitly discredit it and provide reasons for doing so; failing to do so requires that the testimony be accepted as true. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991).

The ALJ properly applied the pain standard by providing adequate reasons for discrediting

22

the claimant's pain testimony.  First, the ALJ determined that the claimant did have underlying medical conditions that could reasonably produce the pain alleged.  However, he did not find the claimant's testimony credible because the record, including the claimant's medical records, lacked sufficient evidence to support the pain *level* she alleged.  Additionally, the claimant's testimony was inconsistent with the medical records. The ALJ reviewed the medical records noting the following:  Dr. Kelsey's records indicated that the claimant was functioning well her on prescribed medication; Dr. Romero's consultative exam demonstrated that the claimant had few physical limitations on her ability to move and lift; and the objective medical tests showed normal results.  The ALJ further based his decision on notes from the claimant's therapist indicating that the claimant felt capable of returning to work and socializing with friends and family. Moreover, Dr. Neville's consultative psychological exam found no appearance of depression or anxiety.  The ALJ committed no reversible error because he explicitly and adequately provided his reasons for discrediting the claimant's pain testimony, and substantial evidence exists to support his decision.

**V.     Whether the ALJ  properly determined the claimant's residual functional capacity when he did not give full credibility to the claimant's pain testimony.**

The claimant contends the ALJ's RFC assessment does not account for how pain may limit her ability to perform nonexertional job requirements. The claimant asserts that the ALJ improperly determined her residual functional capacity because the ALJ failed to mention pain as a limiting factor and, therefore, committed reversible error.  The ALJ's RFC assessment demonstrates that he factored in limitations, both exertional and nonexertional, that could reasonably be expected to result from experiencing pain at some level.  However, because he had properly discredited the claimant's testimony about the severity of her pain and frequency of such

pain, he did not have to base his RFC assessment on the pain level and the pain frequency the claimant alleged.

Residual functional capacity is an assessment of a claimant's ability to do work despite her impairments, based upon all of the relevant evidence. *Lewis*, 125 F.3d at 1440.  "The RFC assessment only considers functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." SSR 96-8p.

The ALJ properly assessed the claimant's residual functional capacity in light of the pain level and pain frequency that he determined to be credible.  The RFC included functional physical limitations resulting from the claimant's pain  from fibromyalgia and low back pain and pain frequency that the ALJ determined to be credible, as well as the recognition that she would be working while taking some pain medication.  Those exertional limitations were the inability to climb ladders, ropes, or scaffolds and limitations on stooping, kneeling, crouching, or crawling. The ALJ further included nonexertional limitations resulting from her credible subjective complaints, specifically limiting the claimant to work only requiring the ability to comprehend and recall *brief* directions; the ability to carry out short and simple instructions; the ability to maintain and sustain concentration for short periods; and no exposure to extreme temperatures or excessive humidity.  These limitations would address, for example, the claimant's credible assertions that her pain and pain medication affected at least to some extent her ability to concentrate for long periods, to comprehend complex instructions, and to work in certain physical environments.  The ALJ further limited the claimant to work only jobs with a flexible schedule and with gradual introduction of changes.

24

Because the ALJ properly listed limitations that pain and pain medication may cause, no requirement for the ALJ to specifically cite or mention pain as a limiting factor existed.  The ALJ did, however, credit the claimant with more limitations than Dr. Romero found in his consultative physical examination and assessment to give the claimant the benefit of reasonable doubt.  Furthermore, because the ALJ had properly discredited the claimant's testimony about the frequency and severity of pain, the ALJ did not have to include any limitations that the medical evidence did not support.  Here, the ALJ properly included limitations that the evidence supported and included some additional limitations to give the claimant some benefit of doubt.  Therefore, the ALJ did not commit reversible error, but rather, properly assessed the claimant's RFC.

### VII.  Conclusion

For the above reasons, this court concludes that substantial evidence supports the decision of the Commissioner and will AFFIRM that decision.  The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 27th day of September, 2012.

_KARON OWEN BOWDRE_
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE